## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Case No. 06-11045 (BLS) |
| | ) | |
| GLOBAL POWER EQUIPMENT | ) | Chapter 11 |
| GROUP INC., et al., | ) | |
| | ) | **Related to Docket Nos. 1911,** |
| Debtors. | ) | **2191, and 2213.** |

### OPINION[1]

Before the Court is an objection (the "Plan Objection")
[Docket No. 2191] from Maasvlakte Energie BV ("Maasvlakte") to
the First Amended Joint Chapter 11 Plan of Reorganization (the
"Plan") [Docket No. 1911] filed by Global Power Equipment Group,
Inc. ("Global Power") and its affiliated debtors (along with
Global Power, the "Debtors").  Maasvlakte objects to the Plan to
the extent that the Plan requires claims denominated in foreign
currency to be converted to United States currency using the
exchange rate prevailing on the day the Debtors filed their
petitions.  For the reasons stated below, the Court will overrule
the Plan Objection.

### I.  BACKGROUND

Global Power, together with its debtor and non-debtor
affiliates, provides power generation equipment and maintenance
services for customers in the domestic and international energy
and power infrastructure industries.  These entities operate

---

[1]   This Opinion constitutes the findings of facts and
conclusions of law of the Court pursuant to Federal Rule of
Bankruptcy Procedure 7052, which is made applicable to contested
matters by Federal Rule of Bankruptcy Procedure 9014.

primarily in three business groups: (i) the Williams Group, which provides routine and specialty maintenance services to utility and industrial customers, (ii) the Braden Group, which engineers and manufactures equipment primarily used to facilitate the operation of gas turbine powerplants, and (iii) the Deltak Group, which, prior to the Debtors' bankruptcy filings, designed, engineered, and manufactured equipment used to enhance the efficiency of gas turbine power plants.

The Deltak Group was the Debtors' heat recovery equipment segment.  The products built by it included heat recovery steam generators ("HRSGs"), specialty boilers, and industrial boilers. In layman's terms, an HRSG uses the hot exhaust from a gas turbine to create steam to run a second power plant.  It typically costs between $10,000,000 and $60,000,000 to produce and is a component to a much larger power plant project that generally costs hundreds of millions of dollars.

Given the competitive nature of the HRSG industry, the Deltak Group operated on narrow margins with regard to its HRSG projects.  Prior to the Debtors' filings, the Deltak Group entered into contracts to build HRSGs on a fixed-price basis and established contract prices based on the projected costs of the project.  These HRSG projects were complex and required significant front-end engineering due to the need to customize products for each customer's particular requirements.  As a

2

result, the construction of an HRSG often took from twelve to twenty-four months to complete.  Because of the long duration of the HRSG projects and the unpredictability of commodity prices, the Deltak Group encountered difficulty accurately projecting costs and thus sustained significant losses.

On September 28, 2006 (the "Petition Date"), the Debtors commenced these cases under Chapter 11 of the Bankruptcy Code primarily on account of (i) losses sustained by the Deltak Group's HRSG business segment and (ii) a liquidity crisis triggered for all of the Debtors by those losses.  Upon filing, the Debtors announced their intention to wind down the operations of those Debtors in the Deltak Group that comprised the HRSG business segment.

Notwithstanding these intentions, the Debtors offered customers with incomplete HRSG projects the opportunity to have the Deltak Group complete those projects.  The Debtors believed that many HRSG customers would still require delivery of the units and be prepared to make the necessary financial accommodations to ensure receipt.  The Debtors also believed that, provided they could do so at no cost to their estates, the orderly completion of the HRSG projects would reduce hardships endured by the Debtors' employees, customers, and vendors, and substantially reduce the number of claims against the Debtors' estates.  In short, the Debtors proposed to reject the Deltak

3

Group's executory HRSG contracts and enter into new agreements with willing customers to complete any such HRSG projects before wind down.  On September 29, 2006, the Debtors filed a motion (the "Wind Down Motion") [Docket No. 12] asking for this Court's approval to implement this strategy.

Through orders (collectively, the "Wind Down Order") [Docket Nos. 64 and 195] entered on October 2, 2006,[2] and October 26, 2006, the Court authorized the wind down of the Deltak Group's HRSG business segment and scheduled a hearing on the proposed rejection of numerous HRSG contracts.  In addition, the Wind Down Order authorized the Debtors to:

> negotiate with customers to reach accomodations for the completion of certain HRSG Contracts in exchange for such customer's agreement, at a minimum, to (i) fund all actual costs of completion on time and materials terms . . . plus the customer's share of any excess costs that would be incurred in the ordinary course outside of the wind down plan, (ii) fund any contractor incentives offered to [c]ontract [e]mployees who are retained to perform on such customer's HRSG project, and (iii) waive all rejection damages claims to the extent the Deltak Debtors complete such customer's HRSG project . . . .

(Wind Down Order.)

On December 22, 2006, Deltak entered into one such agreement (the "Completion Agreement") with Maasvlakte for the completion

---

[2]    An order [Docket No. 85] correcting the October 2, 2006, order was entered on October 5, 2006.

of a project (the "Project") specified in an HRSG contract (the "2004 Contract") that Deltak had entered into with Maasvlakte on December 10, 2004.  Under the 2004 Contract, Deltak had agreed to sell HRSGs, accessories, and other equipment to Maasvlakte as well as provide certain services in connection therewith.  The Completion Agreement provided for (i) the cost-neutral completion of the Project and (ii) defined step-downs of any claim against the Debtors' estates made by Maasvlakte arising from Deltak's rejection of the 2004 Contract, assuming the Debtors achieved agreed milestones in the completion of the Project.  Work under this Completion Agreement is currently ongoing.

On December 29, 2006, this Court entered an order [Docket No. 599] approving the rejection of the 2004 Contract nunc pro tunc to September 29, 2006.  As set forth in the Wind Down Order, the Debtors and Maasvlakte did not need further authorization from the Court to implement the Completion Agreement provided that no interested party objected.  No party objected.

**B.    Procedural Background**

On March 26, 2007, Maasvlakte filed two proofs of claim (together, the "Maasvlakte Claims").  First, Maasvlakte filed a proof of claim (the "Rejection Damage Claim") [Claim No. 1094] against Deltak, L.L.C. ("Deltak"), in an amount stated as between €2,000,000 and €20,000,000, plus additional potential amounts that were contingent and unliquidated as of the claim's filing

5

date.  The Rejection Damage Claim sets forth a right to payment from Deltak for money damages caused by the rejection of the 2004 Contract.  Second, Maasvlakte filed a proof of claim (the "Guaranty Claim") [Claim No. 1094] against Global Power in an amount stated as between €4,480,000 and €9,600,000, plus additional potential amounts that were contingent and unliquidated as of the filing of the claim.  The Guaranty Claim sets forth a right to payment from Global Power for money damages caused by the rejection of the 2004 Contract and its right to claim such damages against Global Power under a parent guaranty (the "Parent Guaranty"), which Global Power had made in favor of Maasvlakte.

On August 29, 2007, the Debtors filed an objection (the "Claims Objection") [Docket No. 1575] to the Maasvlakte Claims. The Claims Objection sought to implement the self-executing procedure for the step-downs set forth in the Completion Agreement.  On September 25, 2007, Maasvlakte filed a response [Docket No. 1724] to the Claims Objection.  The Claims Objection remains pending.[3]

On October 31, 2007, the Debtors filed the Plan.  With respect to claims against Global Power, the Plan provides that

---

[3]     On December 12, 2007, Maasvlakte and the relevant interested parties entered into a limited settlement that, among other things, provided for the temporary allowance for voting purposes only of the Deltak Claim at $25,394,000 and for Maasvlakte to vote in favor of the Plan.

6

holders of allowed unsecured claims are unimpaired and will be paid in full with post-petition interest.  With respect to claims against Deltak, the Plan provides that holders of allowed general unsecured claims will share pro rata in a $34,000,000 fund.  It is expected that this fund will be sufficient to pay all unsecured claims against Deltak in full.

Pursuant to the Plan, payments to creditors will be made in "Cash," which is defined under the Plan as "legal tender of the United States of America . . . ."  Section 18.21 of the Plan requires that "[w]here a [c]laim has been denominated in foreign currency on a proof of [c]laim, the [a]llowed amount of such [c]laim shall be calculated in legal tender of the United States based upon the conversion rate in place as of the Petition Date . . . ."  Thus, the Maasvlakte Claims, which are denominated in Euros, are to be paid under the Plan in United States currency and valued using the exchange rate as of the Petition Date.

On December 14, 2007, Maasvlakte filed the Plan Objection in order for the Court to resolve exchange rate and currency issues. Specifically, the Plan Objection challenges Section 18.21 of the Plan and asks the Court to conclude that the appropriate date from which to draw an exchange rate for valuing the Maasvlakte Claims is the date of the payment of the claims.[4]  On December

---

[4]    The significant decline of the United States dollar's value in relation to the Euro in recent months renders this more than an academic debate.  As of the Petition Date, one Euro

19, 2007, the Debtors filed a memorandum (the "Plan Response")
[Docket No. 2213], responding to the Plan Objection.  On December
21, 2007, the Court entered an order [Docket No. 2233] confirming
the Plan and expressly reserving for later determination the
currency exchange issue.  The Court then conducted oral argument
on the Plan Objection on January 23, 2008.

C.   **The Parties' Positions**

     The Debtors argue that Maasvlakte's entitlement to payment
under the Plan stems from the Maasvlakte Claims, which are based
on the Debtors' rejection of the 2004 Contract and arise by
operation of law as of the Petition Date.  Additionally, the
Debtors argue that the Completion Agreement caps both the amount
of the Maasvlakte Claims and, correspondingly, the ultimate
distribution that Maasvlakte can receive on those claims.  The
Debtors conclude, therefore, that section 502(b) of the
Bankruptcy Code applies and requires, as set forth in Section
18.21 of the Plan, the valuing of the capped Maasvlakte Claims in
United States currency using the exchange rate as of the Petition
Date.

     Maasvlakte argues that the Completion Agreement caps only

---

traded at approximately $1.27.  As of the date the Plan became
effective, January 18, 2008, one Euro traded at approximately
$1.46.  Assuming for the sake of argument an allowed claim of
€20,000,000, these exchange rate differences between the
Petition Date and the Plan's effective date would lead to a
payout difference of approximately $3,800,000.

Maasvlakte's actual recovery, which is a distribution expressly denominated in Euros, and not the underlying Maasvlakte Claims themselves.  Maasvlakte then reasons that, because section 502(b) only requires the Court to value claims, but not distributions, in United States currency, the distribution amounts called for under the Completion Agreement do not fall within the ambit of section 502(b).  Thus, Maasvlakte contends that the Completion Agreement embodies a separately-negotiated "distribution mechanism" and entitles it to receive a distribution either in Euros or in United States dollars using the exchange rate as of the day of distribution rather than the Petition Date.  Alternatively, Maasvlakte argues that case law interpreting section 502(b) and relevant state case law permit the Court to convert the Maasvlakte Claims to United States dollars using the exchange rate as of a hypothetical judgment date.

The matter has been fully briefed and argued.  It is ripe for decision.

## II.  <u>JURISDICTION AND VENUE</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2).

9

### III.  **DISCUSSION**

The Plan Objection requires the Court to resolve two issues:
(i) whether section 502(b) of the Code requires the Court to
convert a contested claim denominated in a foreign currency into
United States currency using the exchange rate as of the petition
date instead of a later judgment or breach date, and (ii) whether
the Completion Agreement provides for caps only on distribution
amounts rather than claim allowance amounts.

### A.  **Section 502(b) of the Code**

Section 502(b) of the Code governs the allowance of claims.
Its plain language requires the Court to determine the allowed
amount of a claim, which is denominated in foreign currency, in
United States currency by using the exchange rate that prevails
on the petition date:

> Except as provided in subsections (e)(2),
> (f), (g), (h) and (i) of this section, if
> such objection to a claim is made, the court,
> after notice and a hearing, **shall determine
> the amount of such claim in lawful currency
> of the United States as of the date of the
> filing of the petition**, and shall allow such
> claim in such amount . . . .

11 U.S.C. § 502(b) (emphasis added).[5]  This section "prevents the

---

[5]      Section 502(b) applies in this case because the
Completion Agreement and the Debtors' Claims Objection
essentially serve as an ongoing claim objection to the Maasvlakte
Claims.  This obviates the need for seriatim objections to the
Maasvlakte Claims as the Debtors achieve milestones under the
Completion Agreement.  Section 18.21 of the Plan, to which
Maasvlakte objects, implements the conversion provided for in
section 502(b).

value of a claim from fluctuating by freezing the claim as of the petition date and converting it to United States dollars.  The amount of the claim will not change, even . . . if the applicable currency rises or falls in relation to dollars."  <u>In re Aaura, Inc.</u>, No. 06 B 01853, 2006 WL 2568048, at *4 n.5 (Bankr. N.D. Ill. Sept. 1, 2006).

Maasvlakte opposes this seemingly clear application of section 502(b) by citing case law that it argues instructs the Court to convert its claim to United States currency using the exchange rate as of either the "judgment day" or the "breach day."  The Court, however, finds the cited case law unavailing. The primary case relied upon by Maasvlakte, <u>In re Good Hope Chemical Corp.</u>, 747 F.2d 806 (1st Cir. 1984), does not deal with section 502(b)[6] and, accordingly, is not instructive to the Court on the present matter.

Furthermore, both <u>Sheils v. 65248 Canada Ltd. (In re MacKay)</u>, No. 5-02-bk-01057, 2007 WL 4248638 (Bankr. M.D. Pa. Oct. 12, 2007) and <u>In re National Paper & Type Co. of Puerto Rico</u>, 77 B.R. 355 (Bankr. D.P.R. 1987), which Maasvlakte argues both

---

[6]    The debtor in <u>Good Hope</u> filed a voluntary petition under the Bankruptcy Act of 1898 for reorganization on October 31, 1975.  <u>Good Hope</u>, 747 F.2d at 807.  The current Code, as enacted on November 6, 1978, and effective on October 1, 1979, does not affect cases filed prior its effective date.  <u>In re Parr</u>, 3 B.R. 691 (E.D.N.Y. 1979).  Therefore, the current Code, which contains section 502(b), did not apply to the debtor's case.

indicate that courts have applied Good Hope when interpreting section 502(b), are distinguishable from the present case.  In both of these cases, creditors' claims were based on final, foreign judgments obtained before commencement of any bankruptcy proceedings and in both cases the courts held that the proper date for determining the appropriate exchange rate was a pre-petition date.  In MacKay, the court held that the proper date was the pre-petition date of the foreign judgments' recordation in the United States.  In National Paper, the court held that the proper date was the pre-petition date when a United States court first recognized the foreign judgment.  Neither case involved a claim's value fluctuating post-petition and neither court endorsed using a post-petition exchange rate that would unfreeze the value of a claim in a manner contrary to section 502(b)'s unambiguous design.

Maasvlakte then argues that other courts have eliminated the need for converting funds altogether by issuing the judgment in the currency in which the parties dealt, whether it be foreign or domestic.  None of the cases cited by Maasvlakte to support this proposition, however, discuss determining the allowed amount of a contested claim pursuant to section 502(b) and none involve a party that has filed for bankruptcy.  Sea-Roy Corp. v. Parts R Parts, Inc., Nos. 98-1028 & 98-1546, 1999 WL 111281 (4th Cir. Mar. 4, 1999) (where the court found no error in instructing the

jury to award damages in the currency in which the parties themselves chose to deal); <u>Matter of Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978</u>, 954 F.2d 1279 (7th Cir. 1992) (where the court entered judgment in the currency with which the parties dealt); <u>Mitsui & Co., Ltd. V. Oceantrawl Corp.</u>, 906 F. Supp. 202 (S.D.N.Y. 1995) (where the court entered judgment confirming an arbitration award in Japanese yen as stipulated by the parties); <u>Manches & Co. V. Gilbey</u>, 646 N.E.2d 86 (Mass. 1995) (where the court entered a judgment, which enforced an English judgment, in pounds or United States dollars converted from pounds using the exchange rate as of the payment date); <u>Union Camp Chemicals Ltd. v. State Street Bank & Trust Co., Inc.</u>, No. 04-P-1153, 2005 WL 1981289 (Mass. App. Ct. Aug. 17, 2005) (where the court entered judgment  in pounds or United States dollars converted from pounds using the exchange rate as of the payment date).  Accordingly, these cases are inapposite to the issue at bar.

**B.    The Completion Agreement**

Maasvlakte next argues that by entering into the Completion Agreement, the parties contracted for specific treatment of the Maasvlakte Claims, irrespective of the provisions of section 502(b).  Review of the Completion Agreement, however, does not provide evidence of an understanding between Maasvlakte and the Debtors as to conversion and payment on terms different from

13

those provided for under the Code.

The "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." <u>Greenfield v. Philles Records, Inc.</u>, 780 N.E.2d 166, 170 (N.Y. 2002).[7]  Both Maasvlakte and the Debtors intended the Completion Agreement to limit the amount of the Maasvlakte Claims.  This is evident from the language used in the Completion Agreement itself.

Section 2.2 of the Completion Agreement expressly limits the amount of the claim Maasvlakte may file against Deltak for the rejection of the 2004 Contract:

> 2.2   <u>Rejection Damage Claim</u>.  If Customer terminates this Agreement in accordance with Section 1.9 of this Agreement prior to the Completion Date, Customer's **claim** against Deltak for rejection and other damages related to the Contract (the "<u>Rejection Damage Claim</u>") **shall not exceed the Rejection Damage Cap** (as defined below).  As used herein, the term "Rejection Damage Cap" means (A) in the event of termination of this Agreement without cause, €3,250,000.00 or (B) in the event of a termination of this Agreement for cause, the amount equal to €20,000,000.00 less the step down amount . . . determined according to the following table . . . .

(Completion Agreement § 2.2 (bold emphasis added).)  Similarly, Section 3.5 of the Completion Agreement limits the amount of the

---

[7]      The Completion Agreement provides that it "will be governed by, and construed and interpreted in accordance with, the laws of the state of New York . . . ."  (Completion Agreement § 4.8.)

claim Maasvlakte may file against Global Power based on the
Parent Guaranty:

> 3.5   Parent Guaranty Claim Cap.  Customer
> agrees that **in no event shall it file a claim**
> (the "Guaranty Claim") against Global Power
> Equipment Group, Inc. ("Global") or any of
> the other Debtors based on the Parent Company
> Guaranty dated January 13, 2005 (the "Parent
> Guaranty") **in excess of the Parent Guaranty
> Claim Cap** (as defined below). . . . [T]he
> term "Parent Guaranty Claim Cap" means the
> amount determined in accordance with the
> following table.

(Completion Agreement § 2.2 (bold emphasis added).)  The parties'
repeated use of the word "claim," and not "distribution," in
Section 2.2 and Section 3.5 evidences the parties' clear intent
to limit claims against, and not solely distributions from, the
Debtors' estates.

Furthermore, the parties' acknowledge in the Recitals to the
Completion Agreement that the Wind Down Order issued by this
Court authorized the Debtors to negotiate completion agreements
with creditors in exchange for those creditors reducing their
claims against the Debtors' estates:

> D.   On October 2, 2006, the Bankruptcy Court
> issued an order . . . granting in part the
> Debtors' Wind Down Motion, which among other
> things, authorized Deltak to negotiate with
> each of its customers to reach accomodations
> for the completion of certain HRSG contracts
> **in exchange for such customer's agreement**, at
> a minimum, **to . . . waive all rejection
> damages claims** to the extent that Deltak
> completes such customer's HRSG project.

(Completion Agreement § D (emphasis added).)  The Wind Down Order

15

does not specifically discuss the reduction of distributions from the estate.  It does, however, permit the Debtors to negotiate with customers in exchange for the reduction of claims against the estate.  Given both parties knew of the Wind Down Order's use of the term "claims" and recited this language within the Completion Agreement, the Court is further convinced the parties intended the Completion Agreement to limit claims and not simply distributions.

In order to make the argument that the parties intended the Completion Agreement to limit only distributions from, and not claims against, the Debtors' estates, Maasvlakte draws upon several of the Completion Agreement's less critical provisions, in which either the term "distribution" is used or the conversion of currency is discussed.  Maasvlakte's reading, however, is strained.

First, Maasvlakte notes that Section 2 of the Completion Agreement is entitled "LIMITATION UPON BANKRUPTCY DISTRIBUTIONS FROM DELTAK'S ESTATE."  Section 4.16 of the Completion Agreement, however, provides that "[t]he headings of the Sections of this Agreement are inserted for convenience only and will not in any way affect the meaning or construction of any provision of this agreement."  (Completion Agreement § 4.16.)  As discussed previously, Section 2.2 of the Completion Agreement operates to limit the amount of the claim Maasvlakte may file against Deltak

16

for the rejection of the 2004 Contract.  Pursuant to Section
4.16, the heading of Section 2 does not affect the substance of
Section 2.2.

Second, Maasvlakte points to a sentence in Section 3.5 of
the Completion Agreement, which it argues expressly states that
the purpose of the Completion Agreement is to limit distributions
on account of the Guaranty Claim and the Rejection Damage Claim,
not to limit the allowable amounts of those claims under
applicable law:

> Notwithstanding anything in this Agreement to
> the contrary, including without limitation
> Sections 1.1, 1.2, 1.3, 1.8, 2.1 and 2.2
> hereof, Customer expressly reserves all
> rights as the non-debtor party to the
> Contract against Deltak arising from the
> rejection thereof, in accordance with Section
> 365(g) of the Bankruptcy Code that are
> necessary to pursue the Guaranty Claim
> against Global and the Rejection Damage Claim
> against Deltak, and Customer shall not be
> deemed to waive or relinquish any rights
> against Deltak to pursue the Guaranty Claim
> and the Rejection Damage Claim, **provided that
> any ultimate distributions upon any such
> claims are subject to the claim distribution
> caps provided in <u>Section 2.2</u> of this
> Agreement (as to the Rejection Damage Cap)
> and the Parent Guaranty Claim Cap set forth
> in this <u>Section 3.5</u>.**

(Completion Agreement § 3.5 (emphasis added).)  The unambiguous
purpose of section 3.5 is to limit the amount of the claim
Maasvlakte may file against Global Power based on the Parent
Guaranty.  The "notwithstanding" sentence to which Maasvlakte

points only serves to make it clear that Maasvlakte reserves all
rights to pursue the Maasvlakte Claims except to the extent those
claims are limited under the Completion Agreement.  It is not
significant that the provision uses the term "distribution" when
it states that "any ultimate distribution upon any such claims
are subject to the claim distribution caps . . . ."  The nature
of any distribution is that it is based on the allowed amount of
the underlying claim and, in this case, the allowed amount of the
underlying claim is capped by the Completion Agreement.

Third, Maasvlakte argues that its right to distributions in
Euros is further manifested by the language of Sections 3.5.3 and
3.5.4 of the Completion Agreement, which provide in their
entirety as follows:

> 3.5.3 Notwithstanding anything to the
> contrary in this Agreement, the Parent
> Guaranty Claim Cap shall exceed
> €8,000,000.00 only to the extent Customer's
> combined Recovery on the Guaranty Claim and
> the Rejection Damage Claim is less than
> €20,000,000.00.  Under no circumstances
> shall the Guaranty Claim exceed
> €9,600,000.00.  As used herein, the term
> "Recovery" means the value of all
> consideration received by Customer from or on
> behalf of any Debtors under a confirmed
> chapter 11 plan of reorganization, as a
> distribution under a chapter 7 case, or
> otherwise on account of the Rejection Damage
> Claim and the Guaranty Claim.
>
> 3.5.4  Subject only to the combined Recovery
> limit set forth in Section 3.5.3 of this
> Agreement, and any applicable law that may
> prohibit Customer from recovering in excess
> of 100% of the value of its claim as between

18

the primary obligor and a guarantor (provided
that the full uncapped value of Customers'
total claim against Deltak under applicable
non-bankruptcy law shall be the measure for
any such "double recovery" rule), any portion
of Recovery received by Customer from
Deltak's estate on account of the Rejection
Damage Claim shall not be deducted from or in
any way reduce either the allowable amount of
the capped Parent Guaranty Claim or the value
of the portion of Recovery that Customer
receives on account of the Capped Parent
Guaranty Claim.  Likewise, subject to any
applicable law that may prohibit Customer
from recovering in excess of 100% of the
value of its claim as between the primary
obligor and a guarantor (provided that the
full uncapped value of Customers' total claim
against Deltak under applicable non-
bankruptcy law shall be the measure for any
such "double recovery" rule), any portion of
Recovery received by Customer from Global's
estate on account of the Capped Parent
Guaranty Claim shall not be deducted from or
in any way reduce either the allowable amount
of the Rejection Damage Claim or the value of
the portion of Recovery that Customer
receives on account of the Rejection Damage
Claim.

(Completion Agreement §§ 3.5.3 and 3.5.4.)  Maasvlakte believes

that the term "Recovery" is a concept expressly measured in

Euros.  It is not.  "Recovery" is "the value of all consideration

received by [Maasvlakte] from or on behalf of the Debtors under a

confirmed chapter 11 plan . . . ."  (Completion Agreement §

3.5.3)  "Value" is not a concept limited to a particular type of

currency or asset; it is a measure of worth which can be

denominated in any way.  Furthermore, the purpose of Section

3.5.3 and Section 3.5.4 is to coordinate the interaction between

19

the two Maasvlakte Claims and prevent double recovery by
Maasvlakte.  It does not limit or define distributions.

Finally, Maasvlakte argues that Section 1.3 of the
Completion Agreement demonstrates the parties' intent to make
distributions to Maasvlakte in Euros or, in the alternative,
United States currency using the exchange rate prevailing at the
time of distribution.  Section 1.3 of the Completion Agreement,
however, only governs "pass-thru" payments by Maasvlakte to the
Debtors' subcontractors.  Section 1.3 does not in any way govern
the exchange rate applied to distributions made to Maasvlakte.
Instead it dictates the exchange rate applied to payments made by
Maasvlakte to vendors and subcontractors, whom Deltak may owe as
a result of their work on the Project.

Maasvlakte argues that, because Section 1.3 is the only
provision in the Completion Agreement discussing the conversion
of currency and because it requires the use of the exchange rate
at the time of payment if payment is not made in Euros, the
parties must have reached an understanding that any payment of
funds associated with the Completion Agreement was to be made in
Euros or converted to United States currency using the exchange
rate at the time of that payment.  The Court disagrees.  If
anything, the fact the parties felt the need to specify an
exchange rate date for this particular type of payment, but not
for valuing or paying on the Maasvlakte Claims, indicates the

20

parties believed or presumed that the Code would provide a default exchange rate date.  As discussed above, the Code does in fact supply an exchange rate date for converting claims: the Petition Date.  There is no reason to believe that the parties intended to use any other exchange rate date than the one provided in section 502(b).

## IV.    **CONCLUSION**

Maasvlakte's Objection to Section 18.21 of the Plan is overruled.  The parties intended the Completion Agreement to dictate the amount of the Maasvlakte Claims and not solely the ultimate distribution Maasvlakte would receive.  Accordingly, section 502(b) applies, and pursuant to Section 18.21 of the Plan, the Maasvlakte Claims will be subject to conversion from Euros to United States dollars using the exchange rate that prevailed as of the Petition Date.

An appropriate Order follows.

By the Court,

_____
Brendan Linehan Shannon
United States Bankruptcy Judge

Dated:  February 14, 2008

21