### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Case No.  06-11045 |
| | ) | |
| GLOBAL POWER EQUIPMENT | ) | Chapter 11 |
| GROUP INC., <u>et</u> <u>al.</u>, | ) | |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | **Related to Docket Nos. 2864, 2888,** |
| | ) | **and 2896** |

#### <u>OPINION</u> [1]

Before the Court is the Motion to Compel (the "Motion")
Maasvlakte Energie B.V. ("Maasvlakte") to Comply with Discovery
Requests [Docket No. 2864] filed by the Deltak Plan Administrator
(the "DPA"). The DPA moves for an order compelling Maasvlakte to:

a. produce immediately those documents in its possession,
   custody or control that are responsive to the two sets of
   document requests propounded upon Maasvlakte by the DPA
   on February 27, 2009 and April 9, 2009 (the "Document
   Requests"); and
b. make witnesses under its control available for deposition
   by the DPA under the Federal Rules of Civil Procedure in
   the United States according to a schedule to be
   negotiated by the parties(the "Deposition Requests").

For the reasons stated below, the Court will grant the Motion to
compel Maasvlakte to comply with the Document Requests and the
Deposition Requests.  The Court will deny the Motion to the
extent the DPA seeks to require witnesses residing in Europe to
appear for deposition in the United States.

---

[1] This Opinion constitutes the findings of facts and conclusions
of law of the Court pursuant to Federal Rule of Bankruptcy
Procedure 7052, which is made applicable to contested matters by
Federal Rule of Bankruptcy Procedure 9014.

## I. __INTRODUCTION__

The matter before the Court is a discovery dispute in a claims objection matter. The claimant is a Dutch entity, and its affiliate and agent, which is in possession of much discoverable information and material, is a French corporation. The discovery process recently stalled when the parties learned that a French law (as described in detail hereinafter, the "French Blocking Statute") may impose penalties on French entities which participate in foreign judicial proceedings other than in accordance with the Hague Evidence Convention.

The question before the Court, therefore, is whether discovery in this contested matter may be taken under the Federal Rules of Civil Procedure, or whether it must be taken by the more laborious provisions of the Hague Evidence Convention. The Court concludes first that the documents and witnesses in the possession of the claimant's French affiliate and agent are within the "control" of the claimant. Second, applying the "comity analysis" articulated by the United States Supreme Court, the Court concludes that discovery in this contested matter should and shall be conducted under the Federal Rules and not under the Hague Evidence Convention.

## II.  **BACKGROUND**

Global Power, together with its debtor and non-debtor affiliates, provides power generation equipment and maintenance services for customers in the domestic and international energy and power infrastructure industries.  These entities operate primarily in three business groups: (i) the Williams Group, which provides routine and specialty maintenance services to utility and industrial customers, (ii) the Braden Group, which engineers and manufactures equipment primarily used to facilitate the operation of gas turbine power plants, and (iii) the Deltak Group, which, prior to the Debtors' bankruptcy filings, designed, engineered, and manufactured equipment used to enhance the efficiency of gas turbine power plants.

The Deltak Group was the Debtors' heat recovery equipment segment.  The products built by it included heat recovery steam generators ("HRSGs"), specialty boilers, and industrial boilers. In layman's terms, an HRSG uses the hot exhaust from a gas turbine to create steam to run a second power plant.  It typically costs between $10,000,000 and $60,000,000 to produce and is a component to a much larger power plant project that generally costs hundreds of millions of dollars.

Given the competitive nature of the HRSG industry, the

3

Deltak Group historically operated on narrow margins with regard to its HRSG projects. Prior to the Debtors' filings, the Deltak Group entered into contracts to build HRSGs on a fixed-price basis and established contract prices based on the projected costs of the project. These HRSG projects were complex and required significant front-end engineering due to the need to customize products for each customer's particular requirements. As a result, the construction of an HRSG often took from twelve to twenty-four months to complete. Because of the long duration of the HRSG projects and the unpredictability of commodity prices, the Deltak Group encountered difficulty accurately projecting costs and thus sustained significant losses.

On September 28, 2006 (the "Petition Date"), the Debtors commenced these cases under Chapter 11 of the Bankruptcy Code primarily on account of (i) losses sustained by the Deltak Group's HRSG business segment and (ii) a liquidity crisis triggered for all of the Debtors by those losses. Upon filing, the Debtors announced their intention to wind down the operations of those Debtors in the Deltak Group that comprised the HRSG business segment.

Notwithstanding these intentions, the Debtors offered customers with incomplete HRSG projects the opportunity to have the Deltak Group complete those projects. The Debtors believed that many HRSG customers would still require delivery of the

4

units and be prepared to make the necessary financial accommodations to ensure receipt.  The Debtors also believed that, provided they could do so at no cost to their estates, the orderly completion of the HRSG projects would reduce hardships endured by the Debtors' employees, customers, and vendors, and substantially reduce the number of claims against the Debtors' estates.  In short, the Debtors proposed to reject the Deltak Group's executory HRSG contracts and enter into new agreements with willing customers to complete any such HRSG projects.  On September 29, 2006, the Debtors filed a motion (the "Wind Down Motion") [Docket No. 12] asking for this Court's approval to implement this strategy.

Through orders (collectively, the "Wind Down Order") [Docket Nos. 64 and 195] entered on October 2, 2006, and October 26, 2006, respectively, the Court authorized the wind down of the Deltak Group's HRSG business segment and scheduled a hearing on the proposed rejection of numerous HRSG contracts.  In addition, the Wind Down Order authorized the Debtors to:

> negotiate with customers to reach accommodations for the completion of certain HRSG Contracts in exchange for such customer's agreement, at a minimum, to (i) fund all actual costs of completion on time and materials terms . . . plus the customer's share of any excess costs that would be incurred in the ordinary course outside of the wind down plan, (ii) fund any contractor incentives offered to [c]ontract [e]mployees who are retained to perform on such customer's HRSG project, and (iii) waive all rejection damages claims to the extent the Deltak Debtors complete such customer's HRSG project . . . .

On December 22, 2006, Deltak entered into one such agreement (the "Completion Agreement") with Maasvlakte for completion of a project (the "Project") specified in an HRSG contract (the "2004 Contract") that Deltak had entered into with Maasvlakte on December 10, 2004.

The Project was to be constructed in an industrial and port zone in Rotterdam, the Netherlands (the "Facility").  The Facility is owned by the Royal Dutch Shell Company.  The Royal Dutch Shell Company had entered into an agreement with Pergen V.O.P., a general partnership, which consisted of Maasvlakte, a Dutch company, and Pernis Energie B.V., a Belgian company, to construct and install a plant on the Facility.  Maasvlakte is the managing partner of the Pergen V.O.P. partnership, which is organized in accordance with the laws of the Netherlands.

The Pergen V.O.P. partnership entered into an agreement with Air Liquide Engineering, S.A. ("ALE"), a French Corporation, for ALE to be the project manager for the Facility.  See Agreement between Maasvlakte and ALE of Dec. 30, 2004, attached as Ex. 1 to Maasvlakte Energie B.V.'s Motion for Commission Pursuant to Hague Convention for Individual Testimony, July 10, 2009, Docket No. 2865.  According to a December 19, 2008 letter from Michel Mathieu, General Manager of Maasvlakte, to Deltak and the DPA (the "Mathieu Letter"), which was written on Air Liquide

6

stationary, ALE "is fully and unconditionally authorized to act
on behalf of [Maasvlakte] as its agent and attorney in fact.  All
matters relating to this letter, the Project, and the Completion
Agreement shall continue to be delegated to ALE."  <u>See</u> Letter
from Michel Mathieu to Deltak, L.L.C. and DPA of Dec. 19, 2008,
attached as Ex. 3 to Decl. of Robert F. Troisio, Aug. 7, 2009,
Docket No. 2893.  As part of the agency agreement, ALE was
required to keep and maintain all documents relating to the
management of the Facility.  ALE employees staffed the Project
and worked with Deltak on drafting the Completion Agreement at
issue.

    ALE, Maasvlakte, and Pernis Energie, B.V. are all sister
corporations under the parent corporation, Air Liquide, S.A.
Maasvlakte is a single purpose entity formed to manage the
workings of the Facility.  The record reflects that Maasvlakte
has only two employees, at least one of whom is paid by another
sister corporation, Air Liquide Industries.

    Under the 2004 Contract, Deltak had agreed to sell HRSGs,
accessories, and other equipment to Maasvlakte as well as provide
certain services in connection therewith.  The Completion
Agreement provided for (i) the cost-neutral completion of the
Project and (ii) defined step-downs of any claim against the
Debtors' estates made by Maasvlakte arising from Deltak's
rejection of the 2004 Contract, assuming the Debtors achieved

agreed milestones in the completion of the Project.

On December 29, 2006, this Court entered an order [Docket No. 599] approving the rejection of the 2004 Contract <u>nunc pro tunc</u> to September 29, 2006.  As set forth in the Wind Down Order, the Debtors and Maasvlakte did not need further authorization from the Court to implement the Completion Agreement provided that no interested party objected.  No party objected.

### A.   <u>Procedural Background</u>

On March 26, 2007, Maasvlakte filed two proofs of claim (together, the "Maasvlakte Claims").  First, Maasvlakte filed a proof of claim (the "Rejection Damage Claim") [Claim No. 1094] against Deltak, L.L.C. ("Deltak"), in an amount stated as between €2,000,000 and €20,000,000, plus additional potential amounts that were contingent and unliquidated as of the claim's filing. On December 12, 2007, Maasvlakte and the relevant interested parties entered into a limited settlement that, among other things, provided for the temporary allowance for voting purposes only of the Deltak Claim at $25,394,000 and for Maasvlakte to vote in favor of the Plan.  The Rejection Damage Claim sets forth a right to payment from Deltak for money damages caused by the rejection of the 2004 Contract.

Second, Maasvlakte filed a proof of claim (the "Guaranty Claim") [Claim No. 1094] against Global Power in an amount stated as between €4,480,000 and €9,600,000, plus additional potential

8

amounts that were contingent and unliquidated as of the filing of the claim.  The Guaranty Claim sets forth a right to payment from Global Power for money damages caused by the rejection of the 2004 Contract and its right to claim such damages against Global Power under a parent guaranty ("the "Parent Guaranty"), which Global Power had made in favor of Maasvlakte.

On August 29, 2007, the Debtors filed an objection (the "Claims Objection") [Docket No. 1575] to the Maasvlakte Claims. The Claims Objection sought to implement the self-executing procedure for the step-downs set forth in the Completion Agreement.  On September 25, 2007, Maasvlakte filed a response (the "Maasvlakte Response") [Docket No. 1724] to the Claims Objection.

The current issue is a discovery dispute concerning evidence in the contested matter of the Maasvlakte Claims.  On February 27, 2009 and April 9, 2009, the DPA propounded upon Maasvlakte discovery requests seeking information on issues such as completion of the Facility, testing of the Facility, communication between the parties and third parties with respect to the testing, and the testing results.  The requests concerned documents and witnesses located in the Netherlands, Belgium, and France.  After filing the Supplemental Objection on February 27, 2009, counsel for the DPA, counsel for the Debtors, and counsel for Maasvlakte began negotiating a discovery scheduling order,

9

including document production dates, proposed deposition dates, and lists of witnesses.

On April 1, 2009, Maasvlakte filed a motion to extend time to respond to discovery requests.  According an agreed-upon schedule, Maasvlakte was to produce at least half of the responsive documents by May 31, 2009 and would complete its production by June 30, 2009.  On April 30, 2009, Maasvlakte served responses and several objections to discovery, none of which concerned any issues under foreign law.  On May 2, 2009, Maasvlakte sent the DPA its first set of document requests, interrogatories, and requests for admissions.  It also served the initial disclosures under Federal Rule of Civil Procedure 26(f).  In its initial disclosures Maasvlakte indicated that it had control of documents and witness testimony located in France, Belgium, and the Netherlands.

**B. <u>The French Blocking Statute</u>**

On May 28, 2009, three days before production was due, Maasvlakte took the position that the DPA must conduct discovery through the Hague Evidence Convention because many of the documents and testimony requested were located in France, and that Maasvlakte was prevented from producing discovery by the French Blocking Statute.

The French Blocking Statute is a French criminal statute that prescribes sanctions for a French national or corporation

who engages in the discovery process of a foreign judicial system
without using the procedures established under the Hague Evidence
Convention.  See French Penal Code Law No. 80-538.  The Hague
Evidence Convention, an international treaty that sets out
procedures (the "Hague Procedures") which signatory nations may
use to facilitate discovery abroad (to which the United States
and France are both signatories), provides that a party may
obtain discovery using either Letters of Rogatory or Letters of
Commission.  See Hague Convention on the Taking of Evidence
Abroad in Civil or Commercial Matters, Mar. 18, 1970, 23 U.S.T.
2555, 1970 T.I.A.S. No. 7444, codified at 28 U.S.C. § 1781
("Hague Evidence Convention").  Maasvlakte seeks to use only
Letters of Commission in this case.[2]

Using Letters of Commission to obtain discovery involves a
U.S. Court issuing the Letters of Commission to a U.S. consular
agent in France.  The agent would then send the Letters to the
French Ministry of Justice for review and acceptance.  The
Letters are not compulsory for the French entity that is
producing discovery.  The record reflects that processing Letters

---

[2]  Under the Hague Evidence Convention, Letters of Request are
given to the French Central Authority who determines the
appropriate implementation of the Letters.  The French Central
Authority then dispatches the Letters of Request to a French
judge who supervises the taking of discovery.  Letters of Request
can take up to six months to complete.  The Letters are mandatory
for the French entity that is producing discovery.  Maasvlakte
does not seek Letters of Request in this case.

11

of Commission through the Ministry of Justice takes approximately two to six weeks.

On May 29, 2009, when the DPA's first motion to compel was before this Court, Maasvlakte raised its concerns regarding compliance with the Hague Evidence Convention and the French Blocking Statute.  The Court directed the parties to meet and confer regarding resolution of this discovery issue.  Ultimately, counsel for Maasvlakte proposed proceeding with the Hague Evidence Convention's Letters of Commission.  Maasvlakte also took the position that the French Blocking Statute precluded the taking of depositions under Rule 34 of the Federal Rules of Civil Procedure and again suggested using the Letters of Commission under Chapter II of the Hague Evidence Convention.

C.  **The Parties' Positions**

Maasvlakte argues that the documents and witness testimony requested by the DPA are located in France and are in the possession and control of ALE.  Maasvlakte states that it can only access the information with permission from ALE, and further contends that ALE is a non-party, sister corporation of Maasvlakte and the two are separate and distinct corporations for the purposes of the control analysis under Federal Rule of Civil Procedure 34.  Therefore, Maasvlakte claims it cannot be compelled to produce the documents or witness testimony in ALE's possession in France.

12

Further, Maasvlakte contends it does not have control over
the information in ALE's possession in France because of the
French Blocking Statute.  It argues that the Hague Procedures are
mandatory because ALE is a non-party and the information is in
ALE's possession in France.

Maasvlakte claims that if the DPA engages in discovery using
the Hague Procedures and, specifically, Letters of Commission,
then ALE will cooperate in production of documents and witness
testimony.  Finally, Maasvlakte argues that even if the Court
finds that the Federal Rules of Civil Procedure govern discovery,
the Court should not direct that the witness depositions be
conducted in the United States, but order that the depositions
occur in France, where the witnesses reside.

The DPA argues that Maasvlakte does indeed have control over
the documents in ALE's possession in France since ALE is
Maasvlakte's agent and attorney-in-fact on the contested matter
at issue.  The DPA notes that Maasvlakte stated in its initial
disclosures that it had control over the documents in ALE's
possession in France and it was ready to produce them up until
the issue of the French Blocking Statute arose.

The DPA further contends that because Maasvlakte is in
control of the documents and information in ALE's possession in
France, the Court need not proceed to the "comity analysis"
required under the Supreme Court's decision in <u>Société Nationale</u>

13

<u>Indust. Aérospatiale v. U.S. Dist. Ct. for the S. Dist. Of Iowa</u>, 482 U.S. 522 (1987), because the Federal Rules of Civil Procedure automatically apply.  Maasvlakte is a party and has submitted to the jurisdiction of this Court by filing the proof of claim.  Alternatively, the DPA argues that if the Court finds that the <u>Société Nationale</u> "comity analysis" is warranted, then the factors used by the Supreme Court weigh in favor of using the Federal Rules of Civil Procedure (instead of the Hague Evidence Convention) to conduct discovery in this matter.

The matter has been fully briefed and argued.  It is ripe for decision.

### III.   <u>**JURISDICTION AND VENUE**</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of this matter constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A), (B), and (O).

### IV.   <u>**DISCUSSION**</u>

The Motion requires the Court to resolve two issues:  (i) whether the discovery the DPA seeks is in the possession, custody or control of Maasvlakte, and (ii) whether the "comity analysis" articulated by the United States Supreme Court in <u>Société Nationale</u> weighs in favor of using the Hague Procedures or the Federal Rules of Civil Procedure.

14

## A. **The discovery the DPA seeks is in the possession, custody or control of Maasvlakte.**

Federal Rule of Civil Procedure 34 states that a party may request the production of documents and other items that are within the "responding party's possession, custody, or control."[3] The Rule makes clear that production need not be confined to what is in the responding party's possession, but may include what is under the responding party's "control" including "information reasonably available to [the responding party] from his employees, agents, or others subject to his control." Gray v. Faulkner, 148 F.R.D. 220, 223 (N.D. Ind. 1992)(quoting 10A Federal Procedure, Law Ed. § 26:377, p. 49 1988)); see also Poole v. Textron, 192 F.R.D. 494, 501 (D. Md. 2000) ("[A] party is charged with knowledge of what its agents know or what is in the records available to it."). The Third Circuit and other courts have held that documents are in the "control" of the responding party if the party has "the legal right or ability to obtain the documents from another source upon demand." Mercy Cath. Med. Ctr. v. Thompson, 380 F.3d 142, 160 (3d Cir. 2004); see also In re Bankers Trust Co., 61 F.3d 465, 469 (6th Cir. 1995); Searock v. Stripling, 736 F.2d 650, 653-54 (11th Cir. 1984). "If a party has control over or shares control of documents with a third person, then a court can order production by means of its power

---

[3] The Federal Rules of Civil Procedure apply to this contested matter through Fed. R. Bankr. P. 7030 and 7034.

over the party litigant." <u>Afros SPA v. Krauss-Maffei Corp.</u>, 113 F.R.D. 127, 128-30 (D. Del. 1986).

Courts have identified a variety of circumstances where a responding party is deemed to have control over documents and materials not in its possession.  In analyzing the body of relevant decisions, the courts in this District have found that to determine whether a litigant was in control of documents held by a non-party, the Court must consider the "nature of the relationship" between the litigant and the non-party.  <u>Afros</u>, 113 F.R.D. at 129-31.  The three main factors used to determine the "nature of relationship" are:

1) the  corporate structure encompassing the different parties,
2) the non-party's connection to the transaction at issue, and
3) the degree to which the non-party will receive the benefit of any award in the case.  <u>Id.</u>

### 1) Corporate Structure

Applying the three factors from <u>Afros</u>, the Court looks first to the corporate structure.

The record reflects that ALE and Maasvlakte are closely intertwined sister corporations.  Maasvlakte and ALE are part of the Air Liquide, S.A. Group.  The Mathieu Letter discussing the continuing authority of ALE to act as agent for Maasvlakte was written on Air Liquide stationary, the parent of both Maasvlakte and ALE.  Maasvlakte is a single purpose entity created to manage

16

the refinery project in the Netherlands for the parent
corporation Air Liquide, S.A.  The record reflects that
Maasvlakte has only two employees.  ALE worked with and on behalf
of Maasvlakte in regard to the Project and specifically the
contract with Deltak that is at issue.  In addition, Maasvlakte
continually made it clear that ALE was the sole actor on "[a]ll
matters relating to...the Project."  <u>See</u> Mathieu Letter, <u>supra</u>.

Maasvlakte contends that the documents and witness testimony
in question are in possession and control of ALE and can only be
accessed by Maasvlakte with ALE's permission.  It claims that ALE
is a non-party, sister corporation of Maasvlakte and the two are
distinct corporations.  Maasvlakte cites to <u>Glaxo, Inc. v.</u>
<u>Boehringer Ingelheim Corp.</u>, for the proposition that control has
been found with sister corporations only on "alter ego" grounds
and that the relationship between Maasvlakte and ALE does not
rise to that level.  1996 WL 710836 *3, *4 (D. Conn. 1996).
These arguments are unpersuasive.  In <u>Glaxo</u>, there was no
evidence other than an assertion that the two entities were
engaged in a joint venture to explain the extent of the
companies' relationship.  <u>Id.</u> at *3.  The court held merely that
"absent further proof of the relationship . . . we cannot hold
the documents . . . are in control of a party."  <u>Id.</u>  That is not
the case here.  There is sufficient evidence in the record
showing the strong interconnection between Maasvlakte and ALE.

Maasvlakte also cites to <u>Penwalt Corp. v. Plough, Inc.</u>, for the proposition that control can be established only where two corporations either had identical boards of directors or the businesses are so intertwined to render meaningless their separate corporate identities.  85 F.R.D. 257, 263 (D. Del. 1979).  Again, the facts of that case are clearly distinguishable from the present case.  In <u>Penwalt</u>, the companies were separate legal entities "having different legal and commercial interests at stake."  <u>Id.</u> at 263.  Here, the record reflects that ALE and Maasvlakte were acting as one for the purposes of the transaction between Deltak and Maasvlakte.  As the Third Circuit has stated, where two sister corporations act as one in the transaction giving rise to the litigation, it may be presumed that there is control by one sister of the documents in possession of the other.  See <u>Gerling Int'l Ins. Co. v. Comm'r of Internal Revenue</u>, 839 F.2d 131, 139-41 (3d Cir. 1988)(quoting <u>Alimenta (U.S.A.), Inc. v. Anheuser-Busch Co.</u>, 99 F.R.D. 309, 313 (N.D. Ga. 1983)).

The record further reflects that ALE is the agent and attorney-in-fact for Maasvlakte as evidenced by the 2004 Agreement between ALE and Pergen VOP, of which Maasvlakte is a General Partner.  Also, the Mathieu Letter established that "all matters relating to this letter, the Project, and the Completion Agreement shall continue to be delegated to ALE."  <u>See</u> Mathieu Letter, <u>supra</u>.  ALE employees handled the deal with Deltak and,

18

as Maasvlakte's representative, even filed a limited objection in
this bankruptcy proceeding [Docket No. 412].

It is well established under agency law that a principal has
control over the actions of its agent. See, e.g., Restatement
(Third) of Agency § 8.01 (2006). An agent cannot withhold from
the principal information that is relevant to the subject matter
of the agency relationship. See id. at §§ 8.01 and 8.11. Courts
have held consistently that documents in possession of the
responding party's agent are within the party's control. See
Gerling, 839 F.2d at 139 (control is established "where the
subsidiary was an agent of the parent in the transaction giving
rise to the suit and in litigating the suit on the parent's
behalf"); see also Commercial Credit Corp. v. Repper (In re
Ruppert), 309 F.2d 97, 98 (6th Cir. 1962)(documents in possession
of a party's attorney, who was its agent, were in that party's
control); McKesson Corp. v. Islamic Republic of Iran, 185 F.R.D.
70, 78 (D.D.C. 1999) (finding that a principal-agent relationship
may be sufficient to establish control required for Rule 34).

Maasvlakte acknowledged in its initial disclosures pursuant
to Federal Rule of Civil Procedure 26(f) that it had control of
the documents in ALE's possession in France. Maasvlakte was
ready to disclose the requested documents until the issue of the

French Blocking Statute arose.[4]  Furthermore, there is nothing in
the record to suggest that Maasvlakte could not obtain the
records in ALE's possession at any time during the ordinary
course of business.  Accord First Nat'l City Bank v. I.R.S., 271
F.2d 616, 618-20 (2d Cir. 1959) (finding that if there is access
to documents in the ordinary course of business, there is
sufficient control).  One court considering the issue found it
"inconceivable" that a principal could not have control of
documents possessed by the agent.  Cooper Industries v. British
Aerospace, Inc., 102 F.R.D. 918, 919 (S.D.N.Y. 1984).[5]

The facts of this case lead to a similar conclusion.  Based
on the close nexus between Maasvalkte and ALE, the record
supports a determination that the first factor of the Afros test
has been met.

---

[4] Maasvlakte argues that the French Blocking Statute takes the
documents in France out of its control.  However, as addressed in
more detail below, Société Nationale states that the French
Blocking Statute does not prevent a party from producing
documents under the Federal Rules of Civil Procedure.  482 U.S.
at 529.

[5] The Cooper court also reasoned that documents in possession of
the defendant corporation's foreign affiliate were in the
defendant's control because a party "cannot be allowed to shield
crucial documents from discovery . . . merely by storing them
with its affiliate abroad.  Nor can it shield documents by
destroying its own copies and relying on customary access to
copies maintained by its affiliate abroad.  If defendant could so
easily evade discovery, every United States company would have a
foreign affiliate for storing sensitive documents."  102 F.R.D.
at 920.

## 2) ALE's Involvement in the Transaction at Issue

Turning now to the second factor from _Afros_, the record reflects that ALE is not only involved, but is actually the main actor in the transaction at issue.  ALE is in charge of the Completion Agreement that gave rise to the proof of claim.  The Mathieu Letter, sent from Maasvlakte to the DPA regarding the notice of default, stated:

> D. Continuing Authority of ALE: Air Liquide Engineering ("_ALE_"), as Project Manager, Engineer and authorized agent for the Customer under and pursuant to the Completion Agreement, is fully and unconditionally authorized to act on behalf of Customer as its agent and attorney in fact.  All matters relating to this letter, the Project, and the Completion Agreement shall continue to be delegated to ALE.

See Mathieu Letter, _supra_.  Maasvlakte reiterated in its papers that ALE acted as "Maasvlakte's authorized representative in connection with the administration of the Contract for the supply of the HRSGs, and that all matters arising under the Contract had to be dealt with [by] ALE" [Resp. by Maasvlakte Energie B.V. to Deltak Plan Administrator's Mot. to Compel, Docket No. 2888 at 4].  ALE was solely in charge of keeping document files for the Project.  In addition, ALE personnel extensively staffed the project.

In the initial disclosures under Federal Rule of Civil Procedure 26(f), Maasvlakte revealed that eleven ALE employees have discoverable information that Maasvlakte may use to support

21

its claim.  The record reflects that Maasvlakte has only two
employees.  Even in a limited objection filed by Maasvlakte in
these bankruptcy proceedings, Maasvlakte stated it was objecting
"through its authorized representative, Air Liquide Engineering"
[Lim. Obj. of Maasvlakte Energie B.V. to Debtor's Emergency Mot.,
Docket No. 412 at 1].  In another Maasvlakte filing, Maasvlakte
explains that ALE met with Deltak representatives in order to
negotiate the Completion Agreement, and "Air Liquide and Deltak
also worked through nearly all drafting issues on the form of
Completion Agreement with respect to the substance of the work
required to be done at the Pergen Project" [Emergency Mot. of
Maasvlakte Pursuant to 11 U.S.C. §§ 105, and 363 to Enforce Side
Letter, Docket No. 438 at 5].

Accordingly, the second factor of the Afros test clearly is
met in this case.  As the party that actually did the work that
forms the basis of the claims in dispute, ALE is inextricably
intertwined in the transaction at issue.

### 3) ALE's Potential Benefit

With respect to the third factor of the Afros test, as the
main entity in charge of the transaction, ALE will benefit if the
proof of claim is allowed.  In its 2008 Financial Performance
Report, the Air Liquide, S.A. Group stated that the 2008 start-up
of the cogeneration unit in Rotterdam was one of the main reasons
for a 25.6% increase in revenue for Air Liquide, S.A.  As part of

22

the Air Liquide, S.A. Group, it can hardly be argued that ALE will not realize some benefit from the favorable resolution of the substantial proof of claim at issue in the case.

Based on the above consideration of the <u>Afros</u> factors, the Court concludes that Maasvlakte has control over documents in possession of ALE.  This conclusion applies equally to both the documents and the witness testimony, as the witnesses are current employees of ALE, Maasvlakte's agent.  Federal Rule of Civil Procedure 30 states that a party may "depose any person, including a party."[6]  Although the majority of cases cited by the parties relate to control analysis under Federal Rule of Civil Procedure 34, the same analysis applies to witness testimony. Under the above analysis, Maasvlakte has control over the information which may be procured through witness testimony as well as through document production.

---

[6] Rule 30 states that a party may "depose any person, including a party without leave of court except . . . if the parties have not stipulated to the deposition and: (i) the deposition would result in more than 10 depositions being taken . . . (ii) the deponent has already been deposed in the case; or (iii) the party seeks to take the deposition before the time specified in Rule 26(d) . . . [or] if the deponent is confined in prison."  Fed. R. Civ. P. 30.

**B.** **The Société Nationale "comity analysis" weighs in favor of using the Federal Rules of Civil Procedure for obtaining discovery from Maasvlakte.**

Having established that Maasvlakte must produce the documents and witness testimony in ALE's possession in France, the Court now turns to the issue of how the DPA may obtain the discovery located in France.  The United States Supreme Court directly addressed this issue, and the French Blocking Statute, in Société Nationale, and held that a party had two options to obtain discovery located in a foreign nation: the Federal Rules of Civil Procedure or the Hague Evidence Convention procedures. 482 U.S. at 529, 533-34, 538.  If, as here, the responding party requests the use of the Hague Procedures, the Court must conduct a "comity analysis" to determine whether the Hague Procedures or the Federal Rules of Civil Procedure should be used to obtain discovery.  Id.

**1)** **The French Blocking Statute.**

Maasvlakte argues that the DPA should procure discovery through the use of the Hague Procedures rather than the Federal Rules of Civil Procedure.  Maasvlakte contends that many of the documents and witnesses are located in France and so are subject to the French Blocking Statute, which prescribes sanctions for French nationals who disclose information while participating in

foreign discovery without going through the Hague Procedures.
See French Penal Code Law No. 80-538.

The French Blocking Statute has three separate provisions
which potentially affect Maasvlakte's ability to produce the
testimonial and documentary evidence located in France.  Article
1A of French Penal Code Law No. 80-538 provides:

> Subject to applicable treaties or international
> agreements, it is prohibited for a natural person having
> the French citizenship or residing in France as well for
> a director, representative, agent or an employee of a
> legal entity having its registered office or a branch in
> France, to communicate by writing, orally or in any
> other form, in whatever place or location, to Foreign
> Public Authorities any documentation or information in
> economic, commercial, industrial, financial or technical
> fields, whenever such communication may be detrimental
> to the sovereignty, security or essential economic
> interests of France or to Public Order as specified if
> need be by the administrative authority.

Article 1, bis reads:

> Subject to applicable treaties or international agreements and
> laws and regulations, it is prohibited for anyone to request,
> look for, or transmit in writing, orally or in any other form,
> any document or information in economic, commercial,
> industrial, financial or technical fields for the purpose of
> gathering evidence in view of foreign civil or administrative
> proceedings or in the framework of said proceedings.

Article 3 provides:

> Subject to heavier penalties provided under the law, any
> infringement to provisions of Article 1 and 1 bis of
> this  Statute  shall  be  punishable  by  a  term  of
> imprisonment of six months and/or a fine of 18,000 €.

25

2)  **<u>The Supreme Court's decision in Société</u>**
    **<u>Nationale</u>**.

The Supreme Court in <u>Société Nationale</u> was confronted with a
discovery dispute in a personal injury action involving a plane
crash in Iowa.  The defendants in the case were airplane
manufacturers located in France.  They sought a protective order,
arguing that the Hague Evidence Convention provided the exclusive
procedures for obtaining discovery located in a foreign nation
and that the French Blocking Statute prevented them from
responding to discovery requests that did not comply with the
Convention.  482 U.S. at 525.  The defendants' motion for a
protective order came after they had answered the complaint and
engaged in initial discovery under the Federal Rules of Civil
Procedure in the district court without objecting to that court's
jurisdiction.  Only when the plaintiffs served the second
requests for the production of documents, interrogatories, and
requests for admissions, did the defendants seek a protective
order.  <u>Id.</u>

The Supreme Court held that the Hague Evidence Convention is
not intended to establish exclusive or mandatory procedures for
obtaining documents and other information located within the
territory of a foreign signatory.  482 U.S. at 529, 533-34, 538.
The Hague Evidence Convention is intended only to establish
optional procedures to help facilitate the taking of evidence

26

abroad.  Id. at 534.  The Court also stated that the Hague

Evidence Convention did not require that "American litigants

first resort to those procedures before initiating any discovery

pursuant to the normal methods of the Federal Rules of Civil

Procedure."  Id. at 542.

The Court further held that the Hague Evidence Convention

"does not modify the law of any contracting state, require any

contracting state to use the Convention procedures, either in

requesting evidence or in responding to those requests, or compel

any contracting state to change its own evidence gathering

procedures."  Id. at 534.  The Court explained that this is true

even where a foreign blocking statute prescribes sanctions in a

foreign country for the party's participation in discovery in the

U.S.:

> It is well settled that such statutes do not deprive an
> American court of the power to order a party subject to
> its jurisdiction to produce evidence even though the act
> of production may violate that statute.  See Société
> Internationale Pour Participations Industrielles et
> Commerciales S.A. v. Rogers, 357 U.S. 197, 204-06
> (1958).  Nor can the enactment of such a statute by a
> foreign nation require American courts to engraft a rule
> of first resort onto the Hague Convention, or otherwise
> to provide the nationals of such a country with a
> preferred status in our courts.  It is clear that
> American courts are not required to adhere blindly to
> the directives of such a statute.  Indeed, the language
> of the statute, if taken literally, would appear to
> represent an extraordinary exercise of legislative
> jurisdiction by the Republic of France over a United
> States district judge, forbidding him or her to order

> any discovery from a party of French nationality, even
> simple requests for admission or interrogatories that
> the party could respond to on the basis of personal
> knowledge.    It would be particularly incongruous to
> recognize such a preference for corporations that are
> wholly owned by the enacting nation.

482 U.S. at 544 n.29.  In addition, the Court noted that the

Hague Procedures are still optional procedures regardless of

whether a party is seeking discovery from a litigant or a third

party.  Id. at 541.

The record reflects that many of the documents and witnesses

Maasvlakte has been requested to produce may be located in

France.  However, as the Supreme Court has held, the French

Blocking Statute is not dispositive of the question whether a

party should procure discovery through the Hague Procedures or

the Federal Rules of Civil Procedure.  Id. at 544 n.29.  This

Court instead must conduct a "comity analysis" to determine which

procedures are warranted.  Id. at 544 n.28.  "[A] party seeking

the application of the Hague Convention procedures, rather than

the Federal Rules of Civil Procedure, bears the burden of

persuasion."  Strauss v. Credit Lyonnais, S.A., 249 F.R.D. 429,

435 (E.D.N.Y. 2008).

The Supreme Court identified five factors to be considered

in conducting any "comity analysis":

> 1) the importance of the documents or information
>    requested to the litigation;

2) the degree of specificity of the request;

3) whether the information originated in the United
   States;

4) the availability of alternative means of securing the
   information; and

5) the extent to which noncompliance with the request
   would undermine important interests of the United
   States, or compliance with the requests would
   undermine important interests of the state where the
   information is located.

Société Nationale, 482 U.S. at 544 n.28.

Courts construing the holding in Société Nationale have
articulated two additional factors for consideration:

6) good faith of the party resisting discovery; and

7) the hardship of compliance on the party or witness
   from whom discovery is sought.

See Strauss, 249 F.R.D. at 454-56.  No one factor is dispositive.

> ### a.  **The documents and depositions sought are central to the dispute.**

This contested matter concerns a proof of claim for damages
allegedly owed to Maasvlakte from Deltak under the Completion
Agreement.  The Agreement called for Deltak to furnish an HRSG to
Maasvlakte for use at the Facility.  The documents and
depositions seek information on central issues such as completion
of the Facility, the testing of the Facility, communications
between the parties and third parties with respect to the tests,
and the test results.  Since ALE was the agent in charge of the

29

agreement between Deltak and Maasvlakte, the documents in
Maasvlakte's control located in France, as well as the witness
testimony of ALE employees who worked on the Project, are central
to resolving the contested matter between Maasvlakte and the DPA.
Cf. Trade Dev. Bank v. Cont'l Ins. Co., 469 F.2d 35, 40-41 (2d
Cir. 1972)(denying the party's discovery requests for the
identities of Swiss bank account customers because the
information was irrelevant to whether a bank employee used the
accounts as part of his fraudulent scheme).

### b.    **The requests are specific.**

The DPA's document and deposition requests are sufficiently
specific.  Maasvlakte has not objected that the requests are
overly broad or unduly burdensome.

### c.    **The documents were created mainly in the Netherlands.**

The documents were not created in the United States, but at
the Project site in the Netherlands where there is no impediment
to their production and in France where the agent of the Project
is located.  Maasvlakte chose to give the documents and delegate
its authority to its agent and attorney-in-fact, ALE, a French
company.  Many of the witnesses, who are employees of ALE and who
worked on the Facility, reside in France.  As discussed above,
however, Maasvlakte, a Dutch company, has retained control over

30

the documents in possession of ALE and the witnesses employed by
its agent ALE.

Although many of the witnesses reside in France, the
information for which they are testifying concerns a facility in
the Netherlands.  The dispute about which they would testify
arose between American and Dutch companies.

###         d.    The alternate means of obtaining the
                  information is not efficient or feasible.

The DPA does not have access to the documents and
information in France and therefore must obtain them through
discovery demands on Maasvlakte.

Maasvlakte contends that the Hague Procedures would be a
viable method for obtaining the documents and witness depositions
that are in France.  Specifically, Maasvlakte requests the use of
Letters of Commission.  Maasvlakte state that its agent, ALE,
will submit an affidavit that it will voluntarily and fully
comply with the Letters of Commission if they are issued.

However, the Letters of Commission are not compulsory under
the Hague Procedures, can take upwards of six weeks to begin the
process, and involve the oversight of the French government.  An
order of this Court under the Federal Rules of Civil Procedure
can be enforced immediately.  Further, using the Federal Rules of
Civil Procedure, and maintaining direct supervisory authority

over discovery with this Court, will allow future disputes that
may arise to be handled in a prompt and efficient manner.

### e.   __The United States has a significant interest in the production of the documents.__

"The comity factor -- requiring analysis of the competing
interests of the United States and France -- 'is of the greatest
importance in determining whether to defer to the foreign
jurisdiction.'"   <u>Strauss</u>, 249 F.R.D. at 443 (quoting <u>British
Int'l Ins. Co., Ltd. v. Seguros La Republica, S.A.</u>, 2000 WL
713057, at *8-9 (S.D.N.Y. 2000)).   The Court must balance the
national interests of France and the United States, and determine
whether those interests favor application of the Hague Procedures
or the Federal Rules of Civil Procedure.

On the one hand, "it is axiomatic that the United States has
a 'substantial interest in fully and fairly adjudicating matters
before its courts.'"   <u>Strauss</u>, 249 F.R.D. at 443 (quoting <u>Minpeco
S.A. v. Conticommidity Servs., Inc.</u>, 116 F.R.D. 517, 523-24
(S.D.N.Y. 1987)).   This includes an interest in securing the
prompt, economical and orderly administration of its bankruptcy
cases.   Using the Hague Procedures will create a substantial risk
of undue delay and expense, and interference with the authority
of this Court.   The resolution of the substantial claim at issue
-- one of the largest remaining disputed claims in this case --
has broad implications for this Debtor and for creditors located

in the United States.  Nevertheless, the Court acknowledges this case does not implicate the kinds of broader societal concerns present in some other cases construing the comity considerations. See, e.g., Strauss, 249 F.R.D. at 443 (United States has a substantial interest in combating terrorism).

On the other hand, the French interest here is particularly attenuated.  The producing party, Maasvlakte, is not a French national, the facility is not in France, the majority of information was not developed in France, and the information was only placed in or transferred to France by a Dutch company which is subject to this Court's jurisdiction.  Maasvlakte's expert, Mr. Sylvain Beaumont, acknowledged during his testimony that he expects that the French ministry will not care about the discovery conducted in this case.  Maasvlakte further admitted in its response papers that "[t]he French Ministry of Justice will have little interest in the depositions or document production concerning the breach of a contract which deals with a matter located in The Netherlands."  See Maasvlakte Response at 18.

### f.   **There is no evidence of bad faith.**

This factor is neutral or weighs slightly in favor of using the Hague Procedures as there is no evidence Maasvlakte acted in bad faith in placing the documents with ALE in France.  In addition, there is no evidence Maasvlakte knew of the French Blocking Statute when it first agreed to produce the documents

33

and witness testimony.  However, the lack of bad faith does not outweigh the six other factors, which favor use of the Federal Rules of Civil Procedure over the Hague Procedures.

### g.    Maasvlakte's hardship is minimal.

The Court must consider the potential hardship compliance with the discovery request imposes upon Maasvlakte.

As an initial matter, the Court notes that Maasvlakte chose to file the proof of claim and subject itself to the jurisdiction of this Court.  Filing a proof of claim in a United States bankruptcy court constitutes submission to the bankruptcy court's jurisdiction for the resolution of the claim and counterclaims. See, e.g., Travellers Int'l AG., v. Robinson, 982 F.2d 96, 98 (3d Cir. 1992) ("[B]y submitting a proof of claim to the debtor's estate, Travellers effectively . . . submitted itself to the equitable jurisdiction of the bankruptcy court.").  Maasvlakte also chose to move the documents related to this claim to France.

Nevertheless, the Court recognizes that by complying with discovery requests under the Federal Rules of Civil Procedure, Maasvlakte could expose itself to potential prosecution.  "The prospect that the foreign litigant would face criminal penalties rather than civil penalties weighs in favor of the objecting party."  Strauss, 249 F.R.D. at 454; see also United States v. First Nat'l City Bank, 396 F.2d 897, 901 (2d Cir. 1968).  "If however, the objecting litigant is a party to the action, courts

34

accord that party's hardship less weight." <u>Strauss</u>, 249 F.R.D. at
454; <u>see also</u> <u>Minpeco</u>, 116 F.R.D. at 526-27.

In the present case, it appears that the chance of
prosecution under the French Blocking Statute is minimal.  France
and the United States each ratified the Hague Evidence Convention
over thirty-five years ago.  <u>Société Nationale</u> held over twenty
years ago that parties may take discovery in France pursuant to
the Federal Rules of Civil Procedure.  Maasvlakte has identified
only one case where the French Blocking Statute has been used to
prosecute a French national for engaging in discovery without
going through the Hague Procedures.[7]  <u>See</u> <u>In re Advocat</u>
<u>"Christopher X"</u>, Cour de Cassation, Chambre Criminelle [Criminal
Chamber of Supreme Court], Paris, Dec. 12, 2007, No. 07-83228.

In addition, other courts have held that "the French
Blocking Statute does not subject defendants to a realistic risk
of prosecution, and cannot be construed as a law intended to
universally govern the conduct of litigation within the
jurisdiction of a United States court."  <u>Bodner v. Paribas</u>, 202
F.R.D. 370, 375 (E.D.N.Y. 2000).  <u>See also</u> <u>Strauss</u>, 249 F.R.D. at
455.

---

[7]  Additionally, based on this Court's review of the facts of <u>In re Advocat "Christopher X"</u>, it does not appear that the attorney who was sanctioned in that case was pursuing discovery in a manner that was ordered or approved by a United States court following consideration and application of the <u>Société Nationale</u> factors.

Maasvlakte has presented no evidence to suggest that ALE or
Maasvlakte faces a significant risk of prosecution if it complies
with the discovery requests pursuant to an order of this Court.
<u>See</u> <u>id.</u> at 451 (noting that the party had "not presented evidence
that it face[d] a specific or significant risk of prosecution for
violations of the French blocking statute if it complie[d] with
its discovery obligations pursuant to court order").

Taken together, the factors established by the Supreme Court
in <u>Société Nationale</u>, and the two factors added by the courts in
the Second Circuit warrant granting the Motion to compel
discovery of both document production and witness depositions
under the Federal Rules of Civil Procedure.

**3)   The Supreme Court makes no distinction between
discovery requests issued to a litigant and requests
issued to a third party.**

Maasvlakte argues that DPA's discovery request is directed
to a non-party, ALE, and therefore the <u>Société Nationale</u> "comity
analysis" does not apply.  Maasvlakte argues that the <u>Société
Nationale</u> holding applies only to discovery directed at a
litigant.  Citing to two District of Delaware cases, Maasvlakte
contends that using the Hague procedures is mandatory for
discovery requests issued to non-parties, such as ALE.  <u>Abbott
Lab. v. Impax Lab., Inc.</u>, 2004 WL 1622223, *2 (2004); <u>Tulip
Computers Int'l B.V. v. Dell Computer Corp.</u>, 254 F.Supp.2d 469,
474 (D. Del. 2003).  In those cases, discovery was requested from

36

third parties who were former employees of a litigant and who
resided in France and the Netherlands.  The Court reasoned that
given that the "witnesses are not parties to the lawsuit, have
not voluntarily subjected themselves to discovery, are citizens
of France, and are not otherwise subject to the jurisdiction of
this court" it was proper to proceed through the Hague
Procedures.  Abbott, 2004 WL 1622223 at *2; Tulip, 254 F.Supp.2d
at 474.

     Maasvlakte's arguments fail for two reasons.  First, as
established above, Maasvlakte has control over the documents in
question that are in the possession of ALE and so the DPA's
request is directed to the party, Maasvlakte, as was the case in
Société Nationale.  Second, even if Maasvlakte was found not to
be in control and the request was directed to a third party
(ALE), the Supreme Court in Société Nationale stated that the
Hague Procedures do not distinguish between discovery taken from
a litigant or a third party:

> [T]he text of the Convention draws no distinction
> between evidence obtained from third parties and that
> obtained from the litigant themselves; nor does it
> purport to draw any sharp line between evidence that is
> "abroad" and evidence that is within the control of a
> party subject to the jurisdiction of the requesting
> court.  Thus, it appears clear to us that optional
> Convention procedures are available whenever they will
> facilitate the gathering of evidence by the means
> authorized in the Convention.  Although these procedures
> are not mandatory, the Hague Convention does "apply" to
> the production of evidence in a litigant's possession in

37

the sense that it is one method of seeking evidence that
a court may elect to employ.

482 U.S. at 541.  The "comity analysis" factors are used
irrespective of whether discovery is sought from a litigant or a
third party.  Neither of the District of Delaware cases to which
Maasvlakte cites state that the Hague Procedures are mandatory;
both reiterate the optional nature of the Hague Procedures whose
purpose is to facilitate the taking of discovery abroad.  Tulip,
254 F. Supp. 2d at 474; Abbott, 2004 WL 1622223 at *2.

**4)**      **The witness deposition will not be required to take
place in the United States.**

Although the depositions of the ALE employees who reside in
France will proceed under the Federal Rules of Civil Procedure,
those depositions are not required to take place in the United
States and may take place in France or some other agreed upon
location.  As noted, comity analysis weighs in favor of using the
Federal Rules of Civil Procedure to obtain the depositions;
however, the interests of time and financial hardship for the
individual witnesses weigh in favor of not requiring the
depositions to occur in the United States.[8]

---

[8]  The record reflects that representatives of the DPA have
already visited the project, and it appears to the Court that the
taking of fact witness depositions in Europe, where they can
presumably be scheduled in series, is, on balance, a more
efficient and practical approach.

## VIII.   <u>CONCLUSION</u>

DPA's Motion is granted in part.  Maasvlakte is in control of the documents and witness testimony located in France under Federal Rule of Civil Procedure 30 and 34.  Accordingly, the U.S. Supreme Court's <u>Société Nationale</u> "comity analysis" applies, and the factors weigh in favor of using the Federal Rules of Civil Procedure to obtain the information located in France.  Therefore, DPA's motion to compel Maasvlakte to produce the documents and witness testimony under the Federal Rules of Civil Procedure is granted.  DPA's motion to compel with respect to the deposition location request is denied.  The depositions need not take place in the United States.

An appropriate Order follows.

By the Court,


_____
Dated: October 28, 2009          Brendan Linehan Shannon
                                 United States Bankruptcy Judge